1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  RICARDO JOHN SEGURA,                    Case No. EDCV 14-1258 SS

12                    Plaintiff,
                                            **MEMORANDUM DECISION AND ORDER**
13        v.

14  CAROLYN W. COLVIN,
    Acting Commissioner of the
15  Social Security Administration,

16                    Defendant.

17

18

19                            **I.**

20                       **INTRODUCTION**

21

22      Ricardo John Segura ("Plaintiff") seeks review of the final

23  decision  of  the  Commissioner  of  the  Social  Security

24  Administration (the "Commissioner" or the "Agency") denying his

25  application  for  Disability  Insurance  Benefits.   The  parties

26  consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of

27  the undersigned United States Magistrate Judge.  For the reasons

28  stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Title II Disability Insurance Benefits ("DIB") on April 26, 2011. (Administrative Record ("AR") 144). He alleged a disability onset date of September 15, 2009. (Id.). The Agency denied Plaintiff's application on July 15, 2011, and upon reconsideration on November 4, 2011. (AR 92, 99). On December 13, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 105). Plaintiff testified at a hearing before ALJ Jay Levine on August 21, 2012 (the "ALJ Hearing"). (AR 43-62). On August 31, 2012, the ALJ issued a decision denying disability insurance benefits. (AR 25-35). Plaintiff filed a request for review of the ALJ's unfavorable decision on September 25, 2012, which the Appeals Council denied on November 1, 2013. (AR 6, 23). Plaintiff filed the instant action on June 20, 2014.

## III.

### FACTUAL BACKGROUND

Plaintiff was born on June 4, 1971. (AR 144). He was thirty-eight years old as of the alleged disability onset date and forty-one years old at the time of his hearing before the ALJ. (AR 46, 144). Plaintiff graduated from high school (AR 46) and completed training as a truck driver, "computer aided" drafter, and real estate broker. (AR 174). Plaintiff received his real estate broker's license in 2004 (AR 49) and was working

1  as a self-employed broker on his disability onset date.  (AR 53-

2  54, 198).  Plaintiff's last-insured date was March 31, 2010.  (AR

3  203, 211).

4

5      Plaintiff first sought an orthopedist's evaluation for low

6  back pain on November 19, 2008.  (AR 456).   He alleges that he

7  ceased working on October 1, 2009 on the advice of his

8  orthopedist.    (AR  54,  173).    In   the   Disability  Report

9  accompanying Plaintiff's DIB application, Plaintiff listed his

10  illnesses as ankylosing spondylitis, low and middle back pain,

11  neck, shoulder and hip pain, pain and swelling in the arms, hands

12  and fingers, "pins and needles" in the right leg, depression, and

13  an inability to sit or walk for long periods.  (AR 173).

14

15  **A.**   **Medical History And Treating Doctors' Opinions**

16

17      **1.   Jack H. Akmakjian, M.D.**

18

19      Dr. Jack Akmakjian, an orthopedist, first evaluated

20  Plaintiff for lower back pain on November 19, 2008.  (AR 456).

21  Plaintiff had previously been treated with lumbar epidural

22  injections and reported "almost 100% improvement in pain" with

23  these injections.   (Id.).   Dr. Akmakjian diagnosed lumbar

24  discogenic disease, right lower extremity radiculopathy and

25  bilateral L5 radiculopathy, and scheduled another epidural

26  injection.  (Id.).  In June and August 2009, Plaintiff continued

27  to report low back pain.  (AR 462, 464).   Epidural injections

28  again provided relief.  (AR 462-64).   Plaintiff was also taking

3

Norco for pain.[1]   (AR 463).   On September 24, 2009, nine days after the alleged disability onset date, Plaintiff was awaiting authorization for further epidural injections.   (AR 466).   Plaintiff complained of increased back pain due to the delay in his injections, trembling in his arms and a "needle sensation around his waist."   (Id.).   Plaintiff was also "missing more days at work" due to pain.   (Id.).   On September 28, 2009, a "Disability Coordinator" in Dr. Akmakjian's office issued a "To Whom It May Concern" letter describing Plaintiff as "totally disabled and unable to work" for one year beginning on September 24, 2009.   (AR 311).

On November 4, 2009, Plaintiff reported that his lower back was injured when a garage door struck him.   (AR 468).   Dr. Akmakjian noted moderate to moderate severe paraspinal muscle spasm, sciatic notch tenderness and two "trigger points" on palpation of the lumbar paraspinal muscles.   (AR 468).   The orthopedist injected a local anesthetic, requested an MRI of the lumbar spine and prescribed physical therapy for six weeks.   (AR 468-69).   On April 20, 2010, Dr. Akmakjian reported that the MRI was "essentially normal," showing "well maintained" intervertebral disc and disc spaces and that the exiting nerve roots and ganglion were normal.   (AR 477).   Plaintiff could carry his eight-month-old baby for short periods of time without lumbar spine pain.   (Id.).   By June 1, 2010, epidural injections were

---

[1]   Norco is a brand-name combination of hydrocodone and acetaminophen.   See   MEDLINEPLUS,   http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited May 18, 2015).

again relieving Plaintiff's pain.  (AR 479).  Although Plaintiff had a prescription for four oxycodone pills per day, he required only two.  (AR 480).  On September 7, 2010, Plaintiff reported that "facet block" injections also helped him "significantly." (AR 483).  Dr. Akmakjian noted that Plaintiff was "rapidly coming to end [sic] as far the treatment options [sic] that we can offer for this patient based upon his MRI findings" and referred Plaintiff for treatment by a rheumatologist.  (Id.).

### 2.   Bikramjit S. Ahluwalia, M.D.

Plaintiff first visited rheumatologist Bikramjit S. Ahluwalia on December 15, 2010.  (AR 358).  On December 20, 2010, an x-ray ordered by Dr. Ahluwalia detected no evidence of injury or abnormality in the sacroiliac joints and surrounding bones. (AR 371).  Dr. Ahluwalia initially diagnosed chronic back pain and osteoarthritis and prescribed Mobic.[2]  (AR 358-59).  On January 19, 2011, Dr. Ahluwalia noted that Plaintiff tested positive for the HLA-B27 antibody and added a diagnosis of ankylosing spondylitis.[3]  (AR 360).  However, Plaintiff felt "somewhat improved" on Mobic and reported that he could engage in

---

[2] Mobic is a brand-name for meloxicam and is prescribed for pain and swelling caused by osteoarthritis.  See MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601242.html (last visited May 18, 2015).

[3] Ankylosing spondylitis is a form of spinal arthritis and an immune disease.  See MEDLINEPLUS, http://www.nlm.nih.gov/ medlineplus/ankylosingspondylitis.html (last visited May 18, 2015).  A positive HLA-B27 test may indicate a susceptibility to this disease, but is not dispositive.  See MEDLINEPLUS http://www.nlm.nih.gov/medlineplus/ency/article/003551.htm (last visited May 19, 2015).

1   some of his activities. (Id.). Dr. Ahluwalia added a
2   prescription for methotrexate on March 23, 2011 (AR 361), and
3   Plaintiff showed further improvement. (AR 362). However, this
4   medication caused Plaintiff's liver enzymes to become elevated,
5   and was discontinued. (Id.).

6

7       On December 14, 2011, Plaintiff reported pain in the left
8   hip, shoulders, neck, and occasionally in the right ankle, but
9   not in the back. (AR 494). Plaintiff was "stiff in the morning
10  for a few minutes," but had no swelling of the joints. (Id.).
11  Dr. Ahluwalia added a fibromyalgia diagnosis to Plaintiff's
12  medical record, but without making any specific findings
13  indicative of this syndrome. (Id.). Dr. Ahluwalia also noted
14  that Plaintiff had "not been exercising as previously instructed,
15  but is trying to watch his diet."[4]  (Id.). In a medical
16  evaluation report filed with the San Bernardino County Department
17  of Child Support Services on June 16, 2011, Dr. Ahluwalia listed
18  Plaintiff as "totally and permanently disabled," with an onset
19  date of December 15, 2010. (AR 524). Nevertheless, at a final
20  visit on April 11, 2012, Plaintiff denied swelling of the joints
21  and reported experiencing morning stiffness only "for a few
22  minutes." (AR 492). Plaintiff was not taking any medications,
23  and Dr. Ahluwalia no longer included spondylitis in Plaintiff's
24  clinical profile. (Id.).
25  \\

26

27  ───────────────
    [4] Over the course of his treatment, Plaintiff's weight varied
    between 209 pounds (AR 482) and 239 pounds. (AR 387). Plaintiff
28  is five feet six inches tall. (Id.)

6

1  **3.   High Desert Primary Care**

2

3       Plaintiff first visited High Desert Primary Care ("HDPC") on

4  October 8, 2009.   (AR 396-98).   On December 1, 2010, Plaintiff

5  sought treatment for swelling of the hands and feet but had "no

6  other complaints today."   (AR 388).   Dr. Nelson Rosales Abrego

7  found Plaintiff's blood pressure elevated, prescribed "[l]ife

8  style modifications" and ordered various tests.   (AR 389).   On

9  June 14, 2011, Plaintiff reported "mild RUQ pain yesterday, which

10  resolved all on its own."[5]   (AR 375).   Dr. Rosales noted an

11  abnormal liver function test "[p]resumably from heavy drinking in

12  the recent past"[6] and diagnosed elevated liver enzymes, obesity,

13  and ankylosing spondylitis.   (Id.).   In a final visit on July 28,

14  2011, Dr. Rosales noted "[p]ain syndrome due to ankylosing

15  spondylitis & fibromyalgia."   (AR 374).

16

17  **B.   Non-examining Physicians' Opinions**

18

19       **1.   A. Lizarraras, M.D.**

20

21       On July 12, 2011, non-examining medical consultant A.

22  Lizarraras, M.D. reviewed Plaintiff's medical records and

23  determined that Plaintiff was not disabled.   (AR 63-74).   Dr.

24  Lizarraras found that one or more of Plaintiff's medically

25  determinable impairments could reasonably be expected to produce

26

27  [5] "RUQ" refers to the right upper quadrant of the abdomen.
   [6] Plaintiff also underwent liver tests in 2008 that showed that
28  his liver was "somewhat echogenic."   (AR 389).

his pain or other symptoms, but found no substantiation for Plaintiff's claims about the intensity, persistence and functionally limiting effects of his impairments. (AR 70). The consulting physician queried a psychiatric consultant regarding Plaintiff's mental health. (AR 69). The psychiatric consultant found that Plaintiff's "main functional limitations remain physical in nature" and noted that despite Plaintiff's alleged depression, his medical records did not mention psychological issues prior to Plaintiff's last-insured date. (AR 70).

**2.  Jay S. Flocks, M.D.**

Jay S. Flocks, M.D., the state agency medical consultant on reconsideration, found Plaintiff "not disabled" On November 3, 2011. (AR 89). Dr. Flocks found that although Plaintiff was limited in his ability to perform certain work activities, he had the residual functional capacity ("RFC") to perform his past relevant work as a real estate broker. (Id.).

**C.  Vocational Expert Testimony**

Vocational Expert ("VE") Kristan Cicero testified at Plaintiff's ALJ hearing regarding the existence of jobs that Plaintiff could perform given his functional limitations. (AR 58-61). The VE identified Plaintiff's previous positions as a computer-aided drafter and a real estate agent and firm manager as his past relevant work. (AR 58-59).

\\

The ALJ posed two hypotheticals to the vocational expert. First, the ALJ described an individual with claimant's age, education, and prior work experience. (AR 60). The individual would be restricted to "light" work, with no work on unprotected heights or subject to vibration and no walking on uneven ground. (Id.). The individual could occasionally climb ramps and stairs, but not ladders, and could occasionally stoop and bend. (Id.). The VE opined that such an individual could work as a drafter or real estate sales manager as those jobs are ordinarily performed. (Id.). The ALJ then asked the VE to assume that the same individual had to be "off task" twenty percent of the time due to pain. The VE opined that such an individual could not find any work. (Id.). In response to a question from Plaintiff's representative, the VE opined that the hypothetical individual also could not find employment as a real estate office manager if he had to miss work three or more times per month. (AR 61).

**D.   Plaintiff's Testimony**

   **1.     Testimony Before the ALJ**

   At the ALJ Hearing, Plaintiff testified that he and his wife had five children who ranged in age from eleven months to sixteen years. (AR 46). Plaintiff retrained as a "computer-aided" drafter after suffering a foot injury in his previous job as a truck driver. (AR 47). After Plaintiff underwent surgery for carpal tunnel syndrome that he attributed to his computer work, he retrained again as a real estate broker. (AR 48-49).

9

Plaintiff managed four offices for his employer and helped rehabilitate repossessed homes to prepare them for sale. (AR 51-52). However, after experiencing increasingly frequent back pain, Plaintiff quit to become self-employed in 2009. (AR 52-53). Plaintiff testified that he ceased work entirely during an economic downturn, because Dr. Akmakjian told him "you've got to stop." (AR 54).

Plaintiff described some of his daily activities. Plaintiff interacted with his children, sitting when possible but sometimes having to "run one of them down, catch them and change a diaper." (AR 55). Plaintiff's wife cautioned him against bending over, but Plaintiff testified that "sometimes you have to." (Id.). Plaintiff reported that gabapentin was "working" to provide partial relief from his back pain. (Id.). Tramadol provided enough pain relief to allow Plaintiff to "sit down somewhere and try to relax." (AR 55-56). Although Plaintiff typically stayed home to watch over his children, he also accompanied his wife on grocery shopping trips and made his own trips to purchase milk and other small items. (AR 57).

### 2.    Statements From Plaintiff's Benefits Application

On May 10, 2011, Plaintiff completed a "function report" as part of his DIB application. (AR 182-89). Plaintiff stated that on a typical day, he took pain medications prior to dressing in the morning. (AR 182). Plaintiff could dress himself unaided, but found it difficult to bend over to put on his underwear,

pants and shoes.  (AR 183).  Plaintiff left home to pick his children up at school at about 1 p.m. each day, returning home at about 4 p.m.  (AR 182).  Later, Plaintiff relaxed by watching television or lying down.  (Id.).  Plaintiff assisted in preparing his children for bed each evening.  (Id.).

Plaintiff was able to change his baby's diaper and helped care for the family's aquarium.  (AR 183).  Although Plaintiff had to hire help to maintain the exterior of his home, he was able to go outside every day and to drive himself on errands.  (AR 185).  Plaintiff shopped in stores once per week for about two to three hours, and also shopped over the Internet.  (Id.).  Plaintiff made social visits approximately twice per week.  (AR 186).  However, pain sometimes made him "grumpy" or caused him to lose interest (AR 187), and often awakened him at night.  (AR 182).  Plaintiff could walk for about ten minutes before needing to rest, and could resume walking after about ten minutes.  (Id.).  Plaintiff used a walker about half the time and used a cane and a brace daily.  (AR 188).  Plaintiff was able to dress, bathe, and shave himself but groomed himself less often due to his pain.  (AR 183).  He sometimes wore a hat rather than caring for his hair.  (Id.).

**E.   Mary Segura's Third Party Function Report**

Mary Segura, Plaintiff's wife, completed a third party function report on May 10, 2011.  (AR 190-97).  Ms. Segura noted that she and Plaintiff were seldom apart and would shop, pick up

11

their older daughter at school and go to doctors' appointments together. (AR 190). Ms. Segura had been pregnant for five months when she completed her report, and stated that Plaintiff helped care for her and for their two youngest children. (AR 191). She noted that Plaintiff's ex-wife sometimes asked Plaintiff to pick up their teenage children. (<u>Id.</u>). Plaintiff helped sort the laundry, take out the trash and straighten their children's toys. (AR 192). However, Ms. Segura did not encourage her husband to engage in these activities because of his pain and difficulty in bending. (<u>Id.</u>). Ms. Segura described her husband as unable to sit for long periods (AR 193), but reported that he drove their daughter to ballet class once a week and waited in the car until the class was over. (AR 194). Although Plaintiff was sometimes "grumpy," Ms. Segura described her husband as a "calm & passive person [who] tries to see positive side of things [and] handles stress very well." (AR 196).

### IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, "a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months." <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant

12

"incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To determine whether a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps and their related inquiries are as follows:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.

(4) Is the claimant capable of performing his past work? If so, the claimant is found not disabled. If not, proceed to step five.

(5) Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled.

\\

\\

1 Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,
2 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20
3 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

4

5     The claimant has the burden of proof at steps one through
6 four, and the Commissioner has the burden of proof at step five.
7 Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an
8 affirmative duty to assist the claimant in developing the record
9 at every step of the inquiry.  Id. at 954.  If, at step four, the
10 claimant meets his burden of establishing an inability to perform
11 past work, the Commissioner must show that the claimant can
12 perform some other work that exists in "significant numbers" in
13 the national economy, taking into account the claimant's residual
14 functional capacity ("RFC"), age, education, and work experience.
15 Tackett, 180 F.3d at 1099, 1100; Reddick, 157 F.3d at 721; 20
16 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do
17 so by eliciting testimony from a vocational expert or by
18 reference to the Medical-Vocational Guidelines appearing in 20
19 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the
20 Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir.
21 2001).  When a claimant has both exertional (strength-related)
22 and non-exertional limitations, the Grids are inapplicable and
23 the ALJ must take thetestimony of a vocational expert.  Moore v.
24 Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v.
25 Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).
26 \\
27 \\
28

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from his disability onset date of September 15, 2009, through the date last insured. (AR 28). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since September 15, 2009. (AR 30). At step two, the ALJ found that Plaintiff had the severe impairment of lumbar discogenic disc disease. (Id.). However, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (AR 31).[7] The ALJ observed that Plaintiff's treating rheumatologist "has inferred, but never specifically stated, that [Plaintiff] had ankylosing spondylitis prior to the date last insured." (AR 30). The ALJ also noted Dr. Ahluwalia's diagnosis of fibromyalgia "albeit without the tender points that until recently were the sole objective criteria for that diagnosis." (Id.). The ALJ opined that physical examinations during the relevant period found "no limitation of any spinal or major joint motions," and noted that findings of motor deficits and spasms "faded from the record after [Plaintiff] was found to have no

_____

[7]   A physical or mental impairment is considered "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520.

15

degenerative changes in his lumbar spine." (AR 31). Further, although Plaintiff complained of depression, he never received any formal mental health treatment or psychotropic medications. (Id.). The ALJ then found that Plaintiff had the following RFC:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except sit six hours in an eight-hour workday with normal breaks, stand or walk six hours in an eight-hour workday with normal breaks, no work on unprotected heights, no vibration, no climbing of ladders, no balancing, occasional climbing of stairs or ramps, and occasional stooping or bending.

(Id.). In reaching this finding, the ALJ stated that he had considered all of Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and Social Security Rulings ("SSRs") 96-4p and 96-7p. (Id.). The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (Id.).

The ALJ found that Plaintiff's subjective allegations regarding the intensity, persistence and limiting effects of his symptoms were "not credible" to the extent that they were inconsistent with Plaintiff's residual functional capacity. (AR 32). The ALJ emphasized that there were no significant objective

findings to support Plaintiff's complaints of pain. (Id.). Plaintiff's physical examinations found "at most" generalized tenderness. (Id.). The ALJ found Plaintiff's medical treatment, centered on pain relief medications, "quite mild" and noted that Plaintiff did not claim to have varied his activities when side effects prevented him from taking his medications. (AR 33). Based on Plaintiff's testimony, the ALJ questioned whether Plaintiff stopped working due to his pain or because of a downturn in the real estate market. (Id.). The ALJ also gave little weight to Ms. Segura's function report, which largely repeated Plaintiff's own subjective evidence. (AR 34).

At step four, the ALJ determined that Plaintiff was capable of performing his past relevant work as a real estate broker-agent and as a "computer aided" draftsman. (Id.). Although these occupations involved some "heavy" work as Plaintiff had previously performed them, they required only sedentary work, consistent with Plaintiff's RFC, as generally performed. (AR 35). Therefore, the ALJ found that Plaintiff was not under a disability as defined by 20 C.F.R. 404.1520(f). (Id.).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence

1   in the record as a whole." Aukland v. Massanari, 257 F.3d 1033,

2   1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen

3   v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.

4   Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).   However, the court

5   must "affirm the denial of disability benefits if it is supported

6   by substantial evidence and the Commissioner applied the correct

7   legal standards." Macri v. Chater, 93 F.3d 540, 543 (9th Cir.

8   1996).

9

10   "Substantial evidence is more than a scintilla, but less

11   than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson

12   v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).   It is "relevant

13   evidence which a reasonable person might accept as adequate to

14   support a conclusion." Id.   To determine whether substantial

15   evidence supports a finding, the court must "'consider the record

16   as a whole, weighing both evidence that supports and evidence

17   that detracts from the [Commissioner's] conclusion.'" Aukland,

18   257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

19   Cir. 1993)).   If the evidence can reasonably support either

20   affirming or reversing that conclusion, the court may not

21   substitute its judgment for that of the Commissioner. Reddick,

22   157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457

23   (9th Cir. 1995)).

24   \\

25   \\

26   \\

27   \\

28   \\

# VII.

## DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds. First, Plaintiff asserts that the ALJ failed to properly consider subjective statements by Plaintiff and his wife or to properly assess their credibility. (Memorandum in Support of Complaint ("MSC"), Dkt. No. 14, at 12). Plaintiff contends that the ALJ "clearly failed to specify which statements by Plaintiff concerning pain, functional limitations, and other symptoms were not 'sufficiently credible.'" (Id. at 14). Second, Plaintiff asserts that the ALJ failed to provide "significant and legitimate reasons" for rejecting Dr. Akmakjian's medical opinions. (Id. at 11). According to Plaintiff, the ALJ was required to contact Dr. Akmakjian if he found the doctor's opinion of Plaintiff's capacity for work inconsistent with the medical record. (Id. at 10).

The Court disagrees with these contentions. The ALJ provided clear and convincing reasons, supported by substantial evidence, for rejecting Plaintiff's testimony. The ALJ also provided specific and legitimate reasons for rejecting Dr. Akmakjian's opinions. Accordingly, for the reasons discussed below, the ALJ's decision must be AFFIRMED.

\\
\\
\\
\\

**A.    The ALJ Offered Clear And Convincing Reasons Supported By Substantial Evidence For Finding The Subjective Evidence Less Than Fully Credible**

Plaintiff contends that the ALJ erred by failing to articulate clear and convincing reasons for finding Plaintiff's subjective testimony less than fully credible. (MSC at 12). The Court disagrees. The ALJ's decision contains extensive citation to and discussion of substantial evidence supporting his credibility findings.

When assessing a claimant's credibility, the ALJ must engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (Id.). If such evidence exists, the ALJ must make specific credibility findings in order to reject the claimant's testimony. (Id.). Unless there is evidence of malingering, the ALJ may reject the claimant's testimony about the severity of his symptoms only by offering "specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1283–84; see also Reddick, 157 F.3d at 722. However, the ALJ may use "ordinary techniques of credibility evaluation" during this inquiry. Smolen, 80 F.3d at 1284. The ALJ may consider any inconsistencies in the claimant's conduct and any inadequately explained or unexplained failure to pursue or follow treatment. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008). Additionally, the ALJ may use evidence of the claimant's ability

1   to perform daily activities that are transferrable to the
2   workplace to discredit his testimony about an inability to work.
3   Morgan v. Comm'r, 169 F.3d 595, 600 (9th Cir. 1999).

5       Here, at the first stage of his credibility analysis, the
6   ALJ found that Plaintiff's medically determinable impairments
7   could reasonably be expected to cause the alleged symptoms. (AR
8   32). At the second stage, however, the ALJ found ample evidence
9   that Plaintiff's account of the intensity, persistence and
10  limiting effects of his symptoms was not fully credible. (Id.).

12      Although Plaintiff contends that the ALJ relied solely on
13  objective medical evidence to discount Plaintiff's credibility
14  (MSC at 15), the ALJ cited Plaintiff's own testimony as grounds
15  to reject Plaintiff's credibility. Specifically, the ALJ noted
16  Plaintiff's descriptions of his ability to shop, run errands and
17  care for his small children even when he was not taking his
18  medications. (AR 33-34). The ALJ also noted Ms. Segura's
19  descriptions of Plaintiff's daily activities, including his
20  ability to shop, drive, make social visits, and pick up their
21  children at school, which undermined Plaintiff's contention that
22  his pain precluded even sedentary work. (AR 34).

24      The Court agrees with the ALJ's finding that Plaintiff's
25  daily activities render his allegations of disabling pain and
26  stiffness less than fully credible. Plaintiff testified that he
27  interacted daily with his three young children, even if he had to
28  "run one of them down, catch them and change a diaper." (AR 55).

Despite Ms. Segura's cautions against bending over, Plaintiff stated "sometimes you have to." (Id.). Plaintiff regularly accompanied his wife on grocery shopping trips and drove his car on errands. (AR 57). Plaintiff spent three hours of each day picking up his children at school (AR 182) and, according to his wife, was able to sit in his car while his daughter attended ballet classes once a week. (AR 194). Although Plaintiff found it difficult to bend to dress himself or to reach while grooming, he was able to undertake these activities unaided. (AR 183). All of these activities call Plaintiff's subjective allegations of disabling pain and stiffness into question.

It was proper for the ALJ to rely on and cite evidence of Plaintiff's daily activities in evaluating whether his subjective testimony was credible. See, e.g., Smolen, 80 F.3d at 1284 (ALJ may consider claimant's daily activities in evaluating testimony as to severity of symptoms); Morgan, 169 F.3d at 600 (ALJ may discount claimant's testimony where normal activities can transfer to the work setting); Fair, 885 F.2d at 603 (daily activities may be reason to discredit excess pain allegation where claimant spends substantial part of the day performing activities that may transfer to a work setting).

Moreover, the ALJ appropriately cited inconsistencies between Plaintiff's testimony and the objective medical evidence. An ALJ may consider such inconsistencies as one factor, among others, bearing on the credibility of a plaintiff's subjective testimony. See, e.g., Thomas v. Barnhart, 278 F.3d 947, 958-60

22

1   (9th Cir. 2002) (ALJ properly considered the lack of objective

2   medical  evidence,  as  well  as  other  factors,  in

3   evaluating the credibility of a plaintiff's subjective testimony

4   regarding the severity of her impairments and pain); Rollins v.

5   Massanari, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective

6   pain testimony cannot be rejected on the sole ground that it is

7   not fully corroborated by objective medical evidence, the medical

8   evidence is still a relevant factor in determining the severity

9   of the claimant's pain and its disabling effects.").

10

11      Here, although Plaintiff attributed his disability to severe

12   pain and stiffness, the ALJ noted that doctors' examinations and

13   diagnostic  tests  consistently  failed  to  support  Plaintiff's

14   contentions.   (AR  32).   The  ALJ  observed  that,  while  Dr.

15   Akmakjian retroactively attributed Plaintiff's disability partly

16   to ankylosing spondylitis, he did not diagnose this illness, note

17   its  symptoms,  or  support  this  diagnosis  with  evidence  in  his

18   treatment  records.   (AR  33).   The  ALJ  also  noted  that  Dr.

19   Ahluwalia,  the  rheumatologist  who  initially  diagnosed

20   spondylitis,  soon  deemphasized  that  diagnosis  in  favor  of

21   fibromyalgia,  also  without  making  any  specific  findings

22   indicative  of  this  disease.   (AR  33-34).   Moreover,  neither

23   illness was diagnosed on or before the date last insured.  (Id.).

24   Finally, as the ALJ noted, Plaintiff's records do not reveal any

25   treatment for depression.  (AR 30).

26

27      The Court concurs with the ALJ's finding that the objective

28   medical evidence calls Plaintiff's allegations of disabling pain

and stiffness into question.   On August 5, 2009, just over a month before the alleged disability onset date, Dr. Akmakjian found that Plaintiff did not require medication for his low back pain, which was already present but managed with epidural injections.   (AR 281).   On March 30, 2010, an MRI found Plaintiff's spinal cord and vertebrae in normal condition, the intervertebral discs and disc spaces normal, and no abnormalities in the associated nerve roots or ganglion.   (AR 410).   On June 1, 2010, Dr. Akmakjian agreed with the radiologist's assessment that the MRI was normal, found Plaintiff in "no acute distress," and noted that Plaintiff experienced improvement with epidural injections.   (AR 336).   On September 7, 2010, Dr. Akmakjian concluded that the pathology of Plaintiff's pain was "unclear" and specifically recommended a rheumatologist's evaluation "to make sure that there is other pathology of pain that we are missing."   (AR 332).   On December 15, 2010, Dr. Ahluwalia, the rheumatologist, noted that he would "[c]heck x-ray of the sacroiliac joint to rule out spondylitis and evaluate for spondyloarthropathy."   On December 20, 2010, x-rays of Plaintiff's sacroiliac joints revealed "no evidence of irregularity, erosion, or ankyloses."[8]   (AR 371).   Dr. Ahluwalia did ultimately describe Plaintiff as disabled, but with an onset date of December 15, 2010, more than a year after the onset date
\\

---

[8] According to the National Institutes of Health, "[t]he hallmark of ankylosing spondylitis is 'sacroiliitis,' or inflammation of the sacroiliac (SI) joints."   See Ankylosing spondylitis at National Institute of Arthritis and Musculoskeletal and Skin Diseases website, http://www.niams.nih.gov/Health_Info/ Ankylosing_Spondylitis/default.asp (last visited May 20, 2015).

24

Plaintiff alleged in his DIB application, further calling his credibility into question. (Compare AR 144 with AR 524).

Moreover, Plaintiff's physicians followed a conservative course of treatment. Evidence of conservative treatment is sufficient to discredit a claimant's testimony regarding the severity of an impairment. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007). Drs. Akmakjian and Aluwahlia managed Plaintiff's symptoms with epidural injections, pain medications, muscle relaxants and physical therapy. Despite Plaintiff's allegations of severe and sustained pain, these physicians typically scheduled Plaintiff's appointments no less than a month apart, and as much as four months apart. (AR 480-88, 492-93, 501-04, 516). None of Plaintiff's physicians recommended surgery. Further, Plaintiff did not seek alternate treatment even when his methotrexate injections had to be discontinued due to side effects. The ALJ could properly infer, on this basis, that Plaintiff's pain was not completely disabling and that his treatment regimen was "quite mild." (AR 32-33); see also Tommasetti, 533 F.3d at 1039 (claimant's failure to seek "alternative or more-tailored treatment program" when medication was discontinued due to side effects raised "permissible inference" of non-disabling pain).

Finally, the state agency consultative physicians found that Plaintiff's treatment record -- in particular the lack of diagnostic tests or clinical evidence to support the ankylosing spondylitis diagnosis -- undermined Plaintiff's credibility. (AR

71, 86). The ALJ properly considered this evidence in concluding that Plaintiff retained the residual functional capacity to maintain his past work. (AR 34). In sum, the ALJ offered clear and convincing reasons for his credibility findings, supported by substantial evidence in the record.

**B.  The ALJ Properly Evaluated The Treating Physicians' Opinions**

Plaintiff contends that the ALJ improperly rejected the opinion of treating orthopedist Jack Akmakjian, M.D. and "failed to follow the proper analysis to resolve what he apparently perceived to be an inconsistency between the doctor's opinion and the record." (MSC at 10). Plaintiff asserts that when the ALJ found such an inconsistency, he was required to contact Dr. Akmakjian in an attempt to resolve it. (Id.). The Court disagrees.

Social Security regulations require the ALJ to consider all relevant medical evidence when determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(b), 416.927(c). "Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians." Smolen, 80 F.3d at 1285. "Therefore, an ALJ may not reject treating physicians' opinions unless he makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Id. (internal quotation marks and citation omitted). However,

1  treating physicians' opinions are not accorded more weight if

2  they are conclusory or unsupported by medical evidence.   Batson

3  v. Comm'r, 359 F.3d 1190, 1195 (9th Cir. 2004).

4

5      Furthermore, the ALJ is responsible for resolving "conflicts

6  in medical testimony."   Andrews v. Shalala, 53 F.3d 1035, 1039

7  (9th Cir. 1995); see also Tommasetti, 533 F.3d at 1041 ("[T]he

8  ALJ is the final arbiter with respect to resolving ambiguities in

9  the medical evidence.").   The ALJ need not address every piece of

10 evidence in the record, but only evidence that is significant or

11 probative.   See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006,

12 1012 (9th Cir. 2006).

13

14      On November 19, 2008, prior to the alleged disability onset

15 date, Dr. Akmakjian diagnosed Plaintiff with lumbar discogenic

16 disease, right lower extremity radiculopathy and bilateral L5

17 radiculopathy.   (AR 456).   These diagnoses did not change when

18 Plaintiff visited Dr. Akmakjian on September 24, 2009, nine days

19 after the disability onset date, despite Plaintiff's complaints

20 of "trembling" arms and a "needle sensation" in his waist.   (AR

21 466).   When Plaintiff next visited Dr. Akmakjian, on November 4,

22 2009, the orthopedist maintained his earlier diagnosis except to

23 add that Plaintiff suffered from chronic low back pain.   (AR

24 469).   On April 20, 2010, twenty days after Plaintiff's last

25 insured date, Dr. Akmakjian's diagnosis was limited to "1. Lumbar

26 back pain. 2. Radiculopathy right lower extremity."   (AR 477).

27 Although Dr. Akmakjian noted that Plaintiff was "tender to

28 palpation at the lumbar spine with paraspinal spasm," and

positive for a right-leg straight rise test, he also observed
that an MRI of Plaintiff's lumbar spine was "essentially normal."
(Id.).

Nevertheless, on October 14, 2011, Dr. Akmakjian completed a
"Multiple Impairment Questionnaire" citing a combination of
ankylosing spondylitis, lumbar discogenic disease with
radiculopathy, and lumbar facet arthropathy as conditions
limiting Plaintiff's ability to sit, stand or walk for extended
periods. (AR 417-24). As the ALJ observed, Dr. Akmakjian's
treatment records contain few specific or detailed findings that
would support these conclusions. (AR 33). Moreover, the
diagnosis of ankylosing spondylitis was made not by Dr. Akmakjian
but by Dr. Ahluwalia, and not until January 19, 2011, after the
insured period had concluded. (AR 360).

Plaintiff asserts that the ALJ should not have discounted
the September 28, 2009, letter from Ms. Orozco, Dr. Akmakjian's
"Disability Coordinator," who declared Plaintiff "temporarily
totally disabled" for a one-year period. (MSC 11-12). Without
citing evidence or authority, Plaintiff contends that Ms. Orozco
was "[c]learly . . . working under the specific direction of Dr.
Akmakjian" and that this letter was "most certainly a reflection
of his opinions." However, as the ALJ specifically noted, a non-
medical professional's opinion is not entitled to any deference
under Agency regulations. See SSR 06-03p, 2006 WL 2329939, at
*1-*2 (listing "acceptable medical sources" qualified to
establish a medically determinable condition); 20 C.F.R. §

28

404.1513(a) (same); see also Molina, 674 F.3d at 1111 (physician's assistant is not an "acceptable medical source").

The ALJ also discussed at length and in detail Plaintiff's treatment history with Dr. Ahluwalia, Plaintiff's treating rheumatologist, and his reasons for discounting this physician's assessments. (AR 33-34). The ALJ noted that although Dr. Ahluwalia initially diagnosed Plaintiff with ankylosing spondylitis, this finding "faded from the record" once the rheumatologist turned his focus to fibromyalgia. (AR 31; see also AR 492-98 (treatment records showing diagnosis of fibromyalgia but not spondylitis)). Nevertheless, Dr. Ahluwalia included ankylosing spondylitis in his July 3, 2011, "Medical Information Verification Report" attesting to Plaintiff's inability to work. (AR 523-25).

The ALJ also specifically noted that while Dr. Ahluwalia increasingly attributed Plaintiff's pain to fibromyalgia, his treatment records do not show that Dr. Ahluwalia ever assessed Plaintiff for this illness.[9] (AR 30-31, 34; see also AR 492-98

---

[9] When determining whether a patient has fibromyalgia, doctors examine eighteen fixed locations ("points") on the body. Doctors press each point firmly to see if the patient flinches. Generally, if a patient flinches after compression of eleven or more points, she will be diagnosed with fibromyalgia. See Rollins, 261 F.3d at 863. Alternatively, a claimant may satisfy Agency criteria for this illness if objective medical evidence shows: (1) a history of widespread pain; (2) "repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions"; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. SSR 12-2p, 2012 WL 3104869, at *3.

1   (treatment records showing fibromyalgia diagnosis, but without

2   any assessment of symptoms or other criteria)).   Moreover, the

3   ALJ noted that Dr. Ahluwalia did not diagnose Plaintiff with

4   fibromyalgia until June 14, 2011, long after the doctor began

5   treating Plaintiff.    (AR 34).    Finally, although Plaintiff

6   questions the ALJ's rationale for discounting the fibromyalgia

7   diagnosis (MSC at 2), Plaintiff did not list fibromyalgia as a

8   disabling condition in his DIB application.   (AR 173).

9

10      Accordingly, it is clear that the ALJ provided "specific,

11  legitimate reasons," supported by substantial evidence in the

12  record, to discount the assessments of Plaintiff's two treating

13  physicians.   See Smolen, 80 F.3d at 1285.   The ALJ also properly

14  resolved inconsistencies in the medical evidence, including

15  conflicts between the treating physicians' diagnoses and the

16  results of diagnostic tests.[10]    Andrews, 53 F.3d at 1039;

17  Tommasetti, 533 F.3d at 1041.   As the ALJ properly evaluated the

18  medical evidence and provided specific and legitimate reasons for

19  rejecting the treating physicians' opinions, no remand is

20  required.

21  \\

22  \\

23  \\

24

---

25  [10] There is no validity to Plaintiff's contention that the ALJ

26  "should have contacted Dr. Akmakjian in an attempt to resolve any
    such perceived inconsistency between his opinion and the record."

27  (MSC 10).   Because the ALJ had sufficient evidence before him to
    resolve any inconsistencies, no further testimony or evidence

28  from the doctor was required.

30

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:   May 26, 2015

_____ /S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER LEGAL DATABASE.**